The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oh yay, oh yay, oh yay. All persons who have any amount or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw a knot and get their attention. For the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Mr. Shultz, when you're ready. Good afternoon, and may it please the Court. I'm Dave Shultz. I'm here on behalf of the petitioners in this Mandamus action. And with me today in the Court is my partner, Kate Bolger, and Sean McGinley. We represent four news organizations who brought this petition for Mandamus, and one non-profit that supports public radio in the state of West Virginia. And what we seek in the dread of Mandamus is an order vacating orders by the District Court that sealed and gagged individuals involved in a very important case going on in the West Virginia right now. The District Court order violates the First Amendment because it prevents essentially any public disclosure of anything touching on, quote, the facts or substance, that's the words of the order, of an important criminal prosecution. And it does that by sealing records as to which there's a constitutional right of access and gagging anyone who knows anything at all about the case. And this is a particularly important case and therefore a particularly wrong case to deny public access. There is heightened public interest and heightened First Amendment concerns in cases of where individuals are accused of these types of crimes. This is a case involving perhaps the most well-known individual in the state of West Virginia. He's been accused of wrongdoing that contributed to the death of 29 people. So the gag order, as you describe it, is pretty broad. I mean, it covers a lot of folks, lawyers, parties, and then it goes into families and stuff. Is your argument different insofar as the individuals who are being gagged? I mean, would it not be – maybe we could read it, say maybe lawyers shouldn't be going around talking or maybe the parties or actual witnesses. Are you asking us to narrow it in alternative if we didn't do it? Or, I mean, what is your perspective on it? Sure, sure. I'll take that. I think the question that you're getting at, Judge Wynn, it has to do with the standard that applies before this type of order can be imposed. A gag order affects individuals' First Amendment rights. There is a long line of cases in this circuit which has said that gag orders can be placed on attorneys because they're officers of the court under a standard of a reasonable probability of prejudice to the defendant's fair trials right. It's a lesser standard. This order goes beyond that. It's not just parties – sorry, it's not just lawyers and it's not just parties who are closely aligned with the lawyers. It goes to witnesses of the crime. It goes to victims of the crime. It goes to families of victims and anyone who potentially has information that might be relevant to the case. That was the point. But the question being is why can't we just say, well, there is a – it goes broad in terms of the other witnesses, all these other parties, but maybe not lawyers, maybe not actual witnesses. Well, I think that is one option. But what I would suggest is that one of the things that would be useful for this court to do is to clarify the standards. It makes a difference when you extend a gag order beyond the lawyers and the parties to others out in the world. They have First Amendment rights. And what we argue or propose in our papers is that when you're going to go that broad, there's a higher standard. You have to have a substantial probability of harm, which is the standard the Supreme Court has used in the Nebraska press case dealing with prior restraints generally, in press enterprise very specifically before you can seal court records, and in the Gentile case dealing with lawyer speech. That was a standard they upheld. Now, this court in Morrissey said that didn't mean a lower standard couldn't be used for lawyers, but we would submit that the higher standard must be used when you get beyond the parties and the lawyers in the case. This is a gag order. The Nebraska press standard, we would submit, should apply. So the answer is yes. We could make a decision to say, okay, as to a certain number of these parties, there's a higher standard that has been met, but it has been met with the other. We could do that. Well, again, our position would be that even the lower standard has been met here, and I'll explain why that is. I understand. I'm just putting it in that vein that is that one of the possible remedies? Absolutely. There should be a higher standard. And just to finish that thought, the Sixth Circuit in CBS v. Young said the higher standard applies to this type of gag. Judge Berger distinguished that incorrectly, mistakenly. She said the Sixth Circuit case is different because it put a gag on the press directly and, therefore, was a prior restraint. That's not true. The district court seemed to, in the memorandum order that followed your motion, seem at least it can be read to say, and I think the court intended it to clarify and narrow the original order as I understand it. And the court seemed to say it was intended to apply only to those who were likely to be witnesses or participants in the trial, leaving aside whether an order can be revised in a memorandum. Well, you know, I think it's a little confusing because in the memorandum, the judge very specifically says this is not a blanket on anyone who knows anything about the facts or substance of the case, but if you read the order, that's exactly what it says. It says if you know anything about the facts or substance. And the gag order, I just want to be clear, the gag order was not changed. It's the same gag order from the original. What she did change was the sealing order. The original sealing order said everything is sealed. But the court did say something about the scope of the gag order in the memorandum. But it's totally unclear what that means. And look at what the impact of it has been. You know, we have a motion pending before the district court right now, which I haven't seen because it's under – no, I take that back. This one is not under seal. But that motion specifically says that there are victims of family members out there who believe that under this order they are barred from going to the state legislature to offering testimony about changes in state law dealing with mine safety. There is a reported article that the Federal Mine Safety and Health Administration in promulgating regulations for mine safety just in the last week took out any reference to the UBB disaster because they were afraid they were going to violate this order. I mean, it's ridiculous. Although the order hasn't been served on anybody. Well, I think – That's true, but – The contempt power, I mean, it would be a real question, wouldn't it? But the problem, the evil of this order is that it's out there and people are aware of it and people feel bound by it. So there's sort of an interiorum effect. Absolutely. Absolutely. And it's not even effective. I mean, we could go through – there's a number of reasons. I wanted to start with what the standard is. As I said, I believe the proper standard for both the gag and the sealing order is that the judge had to find a substantial probability of harm. Now, do the interveners have standing to challenge the gag order? Absolutely. That's been clear in a number of cases. The Second Circuit in the Dow Jones case dealt with this very specifically. Where you have willing speakers or individuals whose news interest is at stake, there is standing in the press. This court said as much, I think, in U.S. v. Matthews in a 2000 case, the same thing. Because our ability to gather – But you're not suggesting that somebody who wants to speak before the West Virginia legislature is looking to speak to the press or to the media. Sure. Is there a difference there? Well, the problem with this order is it gags people who want to speak with the reporters. Reporters have a protection in their ability to gather the news. That's what was said in CBS v. Young by the Sixth Circuit. That's what this circuit said in the Matthews case. So we have standing. And there's clear constitutional harm to our rights. And that's what we're here to protect. And under both the sealing order and the gag order, the standard is, is there a substantial probability of harm to the defendant's fair trial right? There's absolutely no doubt on the sealing order side. This court has said that repeatedly. The Supreme Court said that in Press Enterprise 2. And there's essentially four things that have to be shown to seal a court record where the constitutional right applies. You have to show a substantial probability of harm to a compelling right. Here perhaps the defendant's fair trial right could be a compelling harm. You have to show that there's no alternatives. And this court has said there has to be a substantial probability that alternatives won't work. And you have to show a substantial probability that the order will be effective. And the fourth prong, which this court has also said, and the Supreme Court said in Press Enterprise 2, is that it has to be narrowly drawn. And this order fails at every step. With the first one, the district court fundamentally misperceived what it was she was being asked to do. She recognized or she believed that her obligation, in fact she calls it her duty as a trial court judge, was to prevent taint to the jury pool. That is not what her goal was. Her goal was to be sure that she would be able, when the time came, to find 12 individuals who could set aside any prejudices and decide the information, decide the case on the basis of the evidence and information and argument presented at trial. Knowledge of the case is not jury taint. And so she viewed very clearly her role to do that. She said, for example, on page 6 of her order, that the court has the duty to take specific reasonable steps to guard against prejudice at the outset, where it has knowledge from prior publicity that continued publicity regarding the facts underlying the indictment is likely to taint prospective jurors. That's not the right standard. So that was her first thing. And this court has specifically said that's not the right standard in the Charlotte Observer case that we cite from 1989. What the court said is the issue is not whether there's so much publicity that preventive action is needed, but whether publication of specific information would so tip the balance that action must be taken. So that takes us to the second point. Before you go there, does that lead us to say that we've got to determine what the specific information is? Absolutely. Absolutely. On the sealing order, it's absolutely clear. You can't just enter an order saying prospectively everything in this case is going to be under seal. The court has an obligation to look at the specific information and decide if that information is likely to prejudice the jury pool. Now, there's a slightly different analysis that goes into the gag order because, obviously, you know, you don't have control over people. But when documents come into court, you can't just seal them as they were done here. This is where the legal analysis sometimes can run into a situation with a reality. We're talking about West Virginia. Judge Berger is someone who is very much in the state of West Virginia. She says it's cold country. She knows the environment, and she says environment is important. And yet we get into our analysis and look at that substantial probability, and we seem to divorce ourselves from reality. It's not a discretionary call. I understand that. And yet there's something about here that seems to say when an appellate court is looking at this and we've got a trial court that's with the boots on the ground, know the entire environment of what's going on here, is there something we're missing in this that comes to mind when we start employing formalistic legal terms, not formalistic in the sense they don't exist. They do exist, just as you've said. But, you know, for consistency purposes, we have to. But are we missing something here in our analysis of this case given, I mean, don't we take in consideration those other factors, the environment? I think that it's appropriate to take into consideration the environment that the court is operating, certainly. The problem is what the district court didn't do was take into consideration the scope of the public's right here. She didn't view that as important. She viewed it as subsidiary, and that's just wrong. Subsidiary to a defendant's right to a fair trial. Absolutely. And it's not a subsidiary right. They're co-equal rights. And the court has an obligation to take steps to try to accommodate both of those interests, particularly in a case like this. It's not just that this is a big, important man. It's not someone who a judge on the West Virginia Supreme Court has said has created a cancer in the state courts. And now you're going to have a trial where all the records are sealed? I mean, what are the people going to think about that? How is that going to promote confidence in the judicial system and fairness? That's what the First Amendment right is for. And what the Supreme Court said in Waller is that the First Amendment interests are even heightened where you have charges of official misconduct. And here, as far as we can tell from the docket, the defendant is saying there's been all sorts of prosecutorial misconduct, that the judge should be recused, all of these things happening. Access is critical in this case. And this order fundamentally misunderstands that and applied the wrong standard. And so it's not just the standard. It's, you know, how do you predict? Some of these things are predictive. It's somewhat difficult to. But what the Supreme Court said in Nebraska Press is that what you should be looking at is not just the amount of publicity, but the tone. You know, is it vindictive? There's nothing in the record, as far as I know, that says that the newspaper, the Charleston Gazette, has been going after this person. Is it true that you and your clients have not seen the opposition to your motion to intervene? That's correct, Judge. And that's because? Well, I take it back. We've seen the memorandum that was submitted. We haven't seen the factual support that's cited on the change of venue motion and things like that. Right. I'm not talking about the change of venue. I'm talking about the opposition. I thought your paper suggested that you had not actually seen. We didn't. We actually have received their papers. Okay. But just to finish with this point, because I do think it's important. So it's the tone. And bear in mind, too, that in the opposition that you bring up, what the defendant is saying, he's not saying that we need this because the papers are going crazy and after us. He says we need it because there are protesters carrying signs accusing me of things. We need it because there are state senators and public officials who are making statements. Well, that's going to continue. That's going to continue. This is ineffective. What's not going to happen is the public is not going to know what's happening in the trial and why it's happening and have any sense of fairness. So the order itself is not effective. And, again, that's a point that this court made very specifically in the Charleston observer case. What it said is even if pervasive publicity risks trial rights, closure as a practical matter is not effective where you have this type of publicity. What the court said there was we must be realistic about the imperatives under which a free press operates in our constitutional system. And where closure is wholly inefficacious to prevent a perceived harm, that alone makes it constitutionally impermissible. We have that here. And, finally, in terms of the four-part standard, we have, you know, that it's – she didn't meet the standard of harm. It's not effective. She didn't consider alternatives. What the district court said is, well, jury voir dire or change of venue are not things I can do now, and, therefore, they're not available, which, again, shows she was misperceiving her obligation. She thought her obligation was to prevent taint of the jury pool. But if you step back and say, what does that mean? She's saying, I've got to prevent anybody from knowing anything about this case. That can't be right. There's no suggestion, is there, that there was going to be a sealing of the courtroom. No. On the other hand, there's no suggestion that there wasn't going to be a sealing of the courtroom. No. Right. She does – the court suggests in her memorandum that one of the reasons that she views this as not overly broad is because the proceedings will be open. But motions are oftentimes decided on papers. If you go to an argument and you haven't had a chance to read the papers, it means the reporting is not going to be as accurate. People aren't going to understand what's going on. And, remember, they're barred from asking the – the reporters are barred from asking the lawyers after an argument about what happened. At the same time, if the motions are argued, what's set forth in the papers will be repeated in open court or much of it. Perhaps. I mean, how do you argue a motion? But we'll never know. Mr. Schultz, do you think that weighing change of venue is a proper consideration as an alternative? Absolutely. How so? Isn't that just as equally important as a Sixth Amendment right? As you suggest, you suggest that, of course, you do recognize the right to a fair trial, and you say, I think, aptly, that First Amendment rights also. But is it also venue? That's not just the defender's right. The right to a public trial, not only is two parts to that. It's the right to a public trial and also a jury that's in the state and district where the offense occurred. In the state. I think the constitutional, I believe, is in the state. And district. Well, but in any event, the question is, how do you value these competing rights? And the first question is, you don't even get to a change of venue unless you reach the point that you cannot find 12 impartial jurors. There was a decision handed down by the First Circuit, I just wanted to mention, that came down on Friday. But I understand that. I'm not supposed to question whether or not you might get to that later, but the question right now, you would agree that you can't jettison that interest right now any more than you can the freedom of press, correct? You can't just merely say, well, Judge, you can't just always grant a change of venue at this point, correct? But I would say, Judge, Gregory is right. So much of that is speculative right now. But you don't deny constitutional rights on the basis of that type of speculation. You don't just say, well, we don't cut off the First Amendment right because when we get to trial, we might not be able to find 12 jurors. That's a fair point. But the point is you equally can't say, well, cavalierly, well, just do a change of venue if this is a problem. But the point is a change of venue is an option when you're weighing the different interests. And you have to consider, as I said, this is a very important case, not just to the people of West Virginia, but to people around the nation. And the public has a right and a need to know that justice is being done fairly. And at the end of the day, if there was a determination that you couldn't find an impartial jury in that jurisdiction, then you would have to weigh what are the options. But I just want to make two really quick points, if I might. In all of the cases where the Supreme Court, and there's not that many, where they've said there's been a denial of a due process of the fair trial right because of publicity, it's also included things that happen in the courtroom. And it's always been in cases where there were confessions that were played or that were staged. You don't have that type of content here. This is not a case where the press is going to be repeating and repeating something the defendant said that maybe will violate his right because he's not going to take the stand. In fact, to the contrary, you have a situation where the defendant has made a movie explaining why he's not guilty. He's produced it. He's paid to have it played on public TV. It's on the website today. You can still get it if you live there. Rightly or wrongly, the district court says that because I know what is already transpired in terms of what's being disseminated to the public, the district court is being prophylactic, saying, listen, I'm not going to wait for the train wreck. I'm going to change the rails before the trains collide. And that's fundamental error. I would submit, Judge Greger, you can't prophylactically take away constitutional rights before these showings have been met and before these findings have been made. Well, some level of prescription is permissible on the First Amendment rights. It depends on obviously it's a barrier or a high standard, but there's some cases where even prescription is right. Sure, sure. And there are, as I said, when we were talking earlier with Judge Wynn, there are cases where gag orders are permissible, particularly gag orders on parties and lawyers. There are circumstances, but it's a very high standard, and that standard hasn't been met here. But this public confidence argument, which is just part of what you're talking about, can't be as strong as you were saying it is because the judge said ultimately after he's found guilty or not guilty, you can release this. I mean, if there is some damage to public confidence, they'll have a chance to check it out to see it. I understand the contemporaneousness in terms of the rights to know from an access to the courts, but in terms of public confidence, that's a different animal. No, but there's a number of issues there. I mean, we're not in a country where you don't tell what's going on and you never do find out. I mean, ultimately you will find out. So that will let you know whether the public is going to have confidence in what happened then. You get that point. But I don't want to get hung up on it, but I just think that aspect of it is not as strong as, at least in my view, in terms of the ultimate outcome of things. But I understand the contemporaneousness. And I would make two points. One is it is a contemporaneous right. And, you know, after the fact, you know, news is news when people are interested in an issue. After something is over, to go back and try to parse it apart, you're right. There's some value to that, but it is not a substitute. And even the fact that the judge said this is going to be in place, these restrictions are going to be in place through the trial, is another error. They had to narrowly tailor it. Once she picks a jury, she has control over that jury. You can't continue this all the way through trial and stop access to motion papers and everything once you have the jury. So there's many, many ways that this is inappropriate. And I just wanted to – It seems to me the better argument would be that public confidence should be protected at all times and you shouldn't have to wait until the end of the trial to get it back. Well, I think I would rephrase it. And I would just say that public access is critical to public confidence in the courts. We don't live in a system where we have secret trials. And if you take that away, you undermine the integrity of the judicial system. And it's not just the confidence, but what the Supreme Court said in Richmond newspaper is public access makes courts function better. It prevents perjury. It avoids abuse. It lets people know what's going on. It provides a community therapeutic value. You know, you don't have – there's a lot of inflamed emotions here. You're not going to have the same resolution of that if everything is being done on a sealed record. And just – I know my time is up. I just wanted to point out, the First Circuit last Friday handed down a case, In re Joksir Sarnayev. I probably said that wrong. But it involves many of these same issues. It was a change of venue, not a sealing case. But they make all of the same points about the importance of the availability of jury voir dire as an adequate alternative to doing other types of things to protect defendants' fair trial rights. It talks about all the cases where we have ample evidence that voir dire is appropriate. You know, West Virginia is a state of 1.8 million people. Beckley is a town of 37,000. In Nebraska Press, the Supreme Court said there was not sufficient basis for the prior restraint there, even though it was a murder in a town of 850. Isn't that issue still before the district court on a change of venue? No, no. My point is that this opinion that I wanted to call your attention to – But, I mean, that issue is coming up before the district court. That issue is not here. And we haven't seen those papers, so I really can't comment on it. But my point is that – But you're just straining me to sort of look at a change of venue case and then try to apply it in the First Amendment. I understand the connections, but that is coming up. Right. The point of this First Circuit opinion is voir dire is highly effective. As an officer. You don't need to cut back on these First Amendment rights. The Supreme Court said the same thing in Skilding, where he challenged the fact that he didn't get a change of venue in a case where there was no gag order. The court didn't allow a gag order. And the Supreme Court said there wasn't a denial. Even Justice Sotomayor, who wrote a dissent in that case, did not dispute that an effective voir dire is an appropriate way to remedy any of these harms. She just didn't feel the district court in that case had done enough of a searching voir dire. All of these cases, the Massawi case in this Commonwealth, was going to go to trial, you know, a short car ride from the Pentagon, where he was alleged to have caused great damage. We don't cut off the public's right to know what's going on in courtrooms, particularly criminal courtrooms, to defend the Sixth Amendment interest when there are other avenues available. Thanks. All right. Thank you, Mr. Schultz. Mr. Ruby. Thank you. May it please the court, Judge Gregory, Judge Wynn, Judge Davis, my name is Steve Ruby, and I'm here today for the United States. I appreciate the courts making, or at least some of the courts making, a special trip to Richmond on account of our case. But as the court may surmise from our written submission, I'm going to be very brief today. Was that because you didn't take a position? Correct, Your Honor. So you don't have a position on this? We don't have a position. What are you going to argue? Not a position? Pardon, Your Honor? You're going to argue not a position? If the court will permit, I'd like to take just a brief moment and explain why the United States is not taking a position on the order, and some of that discussion may be of assistance to the court. First of all, and I'll pick up where Mr. Schultz left off, Your Honors, the precedents of this court and the Supreme Court make clear that with or without the order that's being challenged here today, we can have a fair trial with 12 impartial jurors in the Southern District of West Virginia where the crimes that the defendant is charged with occurred. The important thing is, careful, voir dire. Well, if you can have a fair trial, why would you have the order? Your Honor, my understanding is with or without. If you can do it without, why would you have the order? Well, Your Honor, the United States didn't seek the order. I was wondering how long it would be before you said that. We didn't seek the order, Your Honor, and as I said, we don't believe that the order is necessary. I just don't get the with or without. I mean, then you're basically saying you don't need it is what you're saying because there's no with the order you can have a fair trial, I mean, with or without. I mean, it seems as though you're saying this order doesn't make any difference. Well, Your Honor, we're respectful of the balance that the district court is trying to strike here, and I think as the judges have already alluded to, there's a balance that does have to be struck between First Amendment rights on the one hand and the defendant's right to a fair trial on the other. I mean, it didn't come up. I mean, I understand it was so spotty. Somebody had to have said something. I mean, typically the court doesn't walk in and says, I've got something else I want to talk about and start entering an order. The order was actually entered, Your Honor, the day within a few days after the return of the indictment. The record says it was the next day. I believe that's correct, Your Honor. And the first you heard of it was on ECF? Yes, sir. So you didn't ask for it? No, we did not. The defense didn't ask for it? The defense did not ask for it. It just sprung forth. Now, the district court has handled a number of cases, correct, growing out of the incident that brings us here? That's correct, Your Honor. Do you think that that was what the court was drawing on, sort of what was learned in these other cases, what was observed? I don't want to go too far in speculating about Judge Berger's thought process here, but I certainly would suspect that that's a component. You know, a lot of district courts look to the United States for help. Yep. And sometimes it's not enough just to say we take no position. I mean, you have a responsibility. I don't mean you personally, but the United States Attorney's Office has every bit as much an obligation to ensure the defendant enjoys his Sixth Amendment right to counsel and that the public enjoys its First Amendment right of access. I'm just not sure. I don't mean to be critical. And I understand the prosecutor in a case like this is somewhat in a difficult position, but maybe sometimes you ought to just take a position, you know? I know when I was a district judge, I loved it when lawyers stood up and said, Judge, you're wrong. We're not asking you to do it, but we think you might get in trouble here. I understand, Your Honor, and I certainly appreciate the court's point in that regard. And we thought, the United States thought long and hard about whether to take a position in the case or not. And ultimately, as I said, our conclusion was that the district court has a difficult job in striking the appropriate balance. I respect the position you're taking. I think you're doing it. But I'm really interested to see what the defendant says, because if everybody is saying in here, this is for a fair and impartial trial, and the defendant says, well, no, it's not about fair and impartial trial. I've got real problems there because it actually cuts both ways. I mean, there are times, of course, there are a number of cases out, we all know about cases out, which the publicity of it actually helps a defendant. So I don't know. It can cut both ways. But somebody needs to stand up and say somebody believes there can't be a fair and impartial trial before this court. It seems like to me somebody ought to be defending this order other than we respect the balance, which is we don't have an opinion. Well, you've got the best straight face on this I've ever seen. I mean, you just deal with this straight up. I mean, you can write down. I really like it. Your Honor, as I do, I understand. I understand that the point that the court is making one, I guess, by way of some additional explanation. The United States has already decided that we're not going to talk to the media whether the order remains in place or not, whatever. Well, that's DOJ policy. You didn't decide that, right? We're not. Well, there are limited circumstances. Yes, Your Honor. We're not going to talk to the media. The order is not a. And you're probably going to instruct your witnesses, certainly your key witnesses, witnesses, any law enforcement witnesses, investigators. You're not going to have them make a statement. That's absolutely correct. So the order is unnecessary as far as you're concerned. It's not a hindrance to anything that we plan to do in this case. So you have a few other cases out there. You probably wouldn't want to stand up in this court and says, do it in this case. And then other cases come up where you you then would have to apply the same level that you apply here. Just thought, Mr. Ruby, you came up, you suggested that notwithstanding, you really don't have a dog in the fight today, which I appreciate. But you did profit that you had something that might be helpful. What is that? Well, the and I don't know if it's helpful or not, Your Honor, but our view is our view is that is that Vardir and the precedents from this court and the Supreme Court are very strong on this point that Vardir is and is a completely effective method to see the jury, even in cases where there's been substantial publicity. And it's that point, the fact that that Vardir can effectively serve the purpose of seating an impartial jury, even in a publicized case, that that leads us to conclude, as I said at the outset, that the defendant can be tried fairly in the Southern District of West Virginia with or without the order that's that's under discussion today. And did you argue that to the district court? We did, Your Honor. You did? Yes. Yeah. We in the district court argument, we our comments were similar to the comments that I've made here today. We didn't take a position one way or another on the order, but we did make the point that under the precedents, as we understand them, Vardir should be able to to resolve any problems that have arisen as a result of the publicity surrounding this case. So can you this can you can you represent on behalf of the government that your position is that if this court were to remove the order of sealing and the gag order, that it would be nothing adverse to the government's prosecution of this case to the to the end? That's that is our position, Your Honor. All right. Great. Nothing further. Thank you very much, Mr. Ruby. Thank you, Your Honor. Still. May it please the court. William Taylor from a blanket chip. My partner, Michael Smith, has joined us in the courtroom. There's no question there's a sharp disagreement between the defendant and the government as to whether a transfer for trial should be granted in this case. That issue is not before this court. And we respectfully urge the court to refrain from expressing any any views about the appropriateness or not of a transfer in the district court. As far as this issue is not before. Correct. That's correct. I'm stating the obvious. Sometimes that is an abundance of caution. Make sure we understand. Well, I have made that mistake before, Your Honor. And be careful. You get close to a district court judge. Joe, be careful. I would I would not go there, Your Honor. All right. Reminds me of a lawyer who was told by the court that everyone had read the briefs and he didn't need to discuss it. The lawyer said I made that mistake. But the district court, what we do part company with with the petitioners is in the following sense. We do not support dissolution of this order under the present circumstances. The district judge is right about the extent to which this community has been and continues to be affected by the explosion. She lives there. She knows people. She's read the press. And although this indictment doesn't actually charge that, the that the conduct that issue called the explosion, everybody in that district thinks that's what this case is about. And didn't they think that a year ago? I'm sure they did. Two years ago. I'm sure they did. Well, so what does so what does the indictment or the criminal prosecution add? Well, what it adds is the criminal prosecution. But the indictment occurred last November. That's not on a gag order. The fact is being criminally prosecuted. No doubt about it. We know that now. And you've got all these facts, including. Well, I've done a documentary yourself on this and you come out and talk about it. I have four years. I'm not I am not here to to to explore the extent of the publicity. Happy to talk about it if you want. And we have attached to our pleadings the voluminous record that we put in. I don't make sure I understand. You're not here to discuss the extent of the publicity, meaning whether there's already publicity out there. You're not going to discuss that, that a gag order, they're going to gag something that's already out there. No, what I'm what I did say, anything already out there remains public. What I'm trying to say, Your Honor, is that the district court, which whose opinion matters more than mine, looked at the existing publicity and she made findings. She made specific findings about the existing publicity. She said, I have reviewed the publicity, seen statements by the family and investigators. The type of publicity limited by the court's order would inevitably lead to prejudice in this case. But that's not just that doesn't comport with the law. That would be a discretionary determination by a judge. Yet there are four factors that have to be considered in determining whether that can be done. I mean, that was the very question I asked. I mean, why can't a judge just who lives here, walks and knows everything that's going on, you know, comport with her common sense and and a feel for things. And and yet there is the law in this. That's pretty, pretty defined. Certainly. Certainly so. Certainly so. But a district judge has to do what is within her power to assure fair trial. No one disputes that there is prejudicial publicity in this case. And I think I'm not so sure that's true, Mr. Taylor. You see, publicity does not equal prejudice. The cases tell us that over and over again. I don't think there's any such thing as inherent prejudice. That's the meaning of these cases that you've got to go through step by step and assess very carefully what prejudice is likely to arise in the light of the alternatives. That can be undertaken if such things as portraits of pictures of Mr. Blankenship with the word murderer underneath are the kinds of things we're talking about. We're talking about public investigations. The court referred to four investigations by public agencies, all of which concluded that the safety violations at Massey caused the explosion. Exactly. Been in the public record for over a year. That's what I'm having difficulty with is how do you get from all of that's out there? And yet the ceiling order. And this gag order. Has the purpose of taping up people's mouths around stuff they've been talking about for years. Well, I apologize, I missed I missed your point. What what she says is at page six, given the prior publicity. Continued publicity regarding the facts is likely to taint prospective jurors. And to the extent that the petitioners argue that she did not make findings. We fundamentally disagree. Well, I think the port, the part that you read a moment ago, using the word inevitable. I think that's as Judge Wynn suggested. Maybe you didn't mean it, but it sounds to me like a conclusion of law, much more than a finding of fact to say that prejudice is inevitable. That is, it seems it does. She does say that. And the deference to a district judge on a mandamus standard is substantial. If I might say, Your Honor, the the petitioners criticize the district court for not making a balancing search of alternatives for not with the help of the parties. That well, she they say they say she didn't consider other alternatives. And I must say that argument has some force. It seems to me that it certainly had some force as of November the 14th when it was issued and of January when it was modified. Had the district judge said, I have before me a motion to transfer. And I'm going to not I'm going to I'm going to keep my gag and sealing order in effect until I decide the motion to transfer. Then it seems to me disturbing her discretion in that regard would be quite a different question for an appellate court on a mandamus standard. And in fact, that's where we are. Are what we have said to this court is that is where we are. There is pending below. The motion to transfer, but haven't we said following the Supreme Court. That there is no de minimis exception to the First Amendment. I mean, you could close a court for a day. You could close court records for a week while something happens. But I just don't see how that's consistent with just decades and decades of precedent. Your Honor, the denial of First Amendment right is per se irreparable. I find myself in the position of defending a an order, which you didn't ask for by terms restricts First Amendment rights. And but it is in my client's interest that that order. I want to make sure I understand what you just said. You are defending an order which by its turn violates. No, I said affects First Amendment rights. I said affects. I said affects. And if I didn't, I meant to. But what I've said to you is what I've said to this court. Tell me, how does it affect First Amendment right? I'm intrigued. Well, the petitioners can have made that case. No, I want you to tell me what you think. You stand up arguing it. You say you admit something. You tell me that by its turn, it affects First Amendment right. Every gag order affects First Amendment rights by definition. And the reason why gag orders are sustained. But there are exceptions when you can show that it has met. There's a compelling interest. Still affects. It's been narrowly. It still affects First Amendment rights. So tell me what it is that makes this narrowly tailored within the First Amendment exception to allow it to be done. I'd rather I will try, but I'd rather if I may finish my thought. If the district court grants the motion to transfer. Then this order largely becomes moot. And if the district court doesn't grant the motion to transfer. Then we are no longer in a what if situation for this court's judgment. You can measure the harm or the court's evaluation of the harm against the actual place. In the actual place where the trial is going to take place. My point to you is that as a matter of appellate administration of a trial court's pretrial docket. That the fact that we have pending in this case, a motion to transfer, which is a serious motion, if I do say so myself. And I can't tell you when it's going to be decided. Because there are other motions which are filed together with it, including a motion for disqualification is pending. But the gag order applies even to that motion. So you can't even talk all this time. If there are first amendment rights that are being affected or offended or implicated or violated. One of those terms probably applies. We ought to let that go on until a motion is decided. I mean you lose your first amendment rights until the motion is decided. I don't think I'd make that argument your honor. But that's the reality. The reality is you're saying no need to make a decision here. Wait until the trial court makes a decision on venue. And then if, you know, so what if we assume they're being violated. There's no harm, no foul down the road. This case presents some difficult constitutional questions. And I think appellate courts frequently prefer not to resolve questions which are not necessary to resolve. My point to you is that if the transfer is granted, this becomes moot. I cannot respectfully tell you when that will be. Nor which district judge will make that decision. Because as you know, we have requested that the chief judge appoint another judge to hear this case in that district. And we do not know when that motion or the others will be decided I presume promptly. From a best case, at the very least you would say if you're going to vacate the order, do so without making a whole lot of statements. Just vacate the order and let it go. Is that where you're going with this? That's generally good advice, your honor. Well, no, I want to know your position. That sounds like to me exactly what you're saying. You're saying essentially there's a motion to venue. What we are afraid is that the court is going to say something today that's going to affect that venue motion. That's correct. And so you're saying, judge, just give us a per cum opinion that says vacate. With no opinion, you won't go criticizing the court for not having given you some reason. I wouldn't do that anyway. But I certainly agree with your observation as to the thrust of our argument. We had two points in being here. One is to respectfully suggest that whatever you decide to do should be done with a view to the fact that people are going to look at it. In terms of the transfer issues. And the less you say about that, obviously, the better for all concerned, I think. I got your point. All right. Thank you very much. Thank you. Mr. Shultz, do you have some time? You okay with that? We could just in an order and say vacate. And you win the case. So you wouldn't be happy with that? With putting it off until after the motion is changed? Don't put it off. Just vacate the gang order in order to seal the order and just say that's it. That's certainly a step in the right direction. I think it would be more helpful to the district courts if you clarified what was wrong here. The standards and the failure to consider alternatives and the various other things. But you would win. You would win to date, right? The First Amendment rights of the press and the public would be vindicated. I just want to make a couple quick things. First, I wanted to apologize about that confusion before to clarify the record. We did receive the papers. We didn't get them until after the motion to intervene was granted. And so we didn't have them at the time of oral argument in the district court just to clarify that, which is in our brief. We argued this originally on no grounds. The other thing, the question that came up in discussing this with the government and with the defendant about this being a sua sponte order, it's my understanding that this is not an unusual order for this particular judge to enter. It wasn't unique to this case, which is all the more reason why there needs to be some guidance from this court about what goes on. Do you know of other Massey-related cases or just generally? You don't know. I'm not sure, and I don't know how many. But I understand that this was definitely done by the judge and it's not something that was done for the first time. It's always dangerous to do that. I mean, you're asking us to send a message, but we just got this case. Absolutely. There's always this scuttlebutt, that's a Navy term, of other stuff going on. It's dangerous to enter something to try to teach this judge how to do something when all we have is I understand it's not unusual. That's fair enough, Judge. But on the basis of what's in front of you, I believe that there's plenty that could be said about what was wrong with this particular order. I just wanted to respond then briefly to the points that were being made by the defendant's lawyer here about the motion to change venue changing everything. I mean, number one, of course, that's a sealed motion in and of itself, which is an odd thing that we're arguing this mandamus petition on a sealed record. But it doesn't address the fact that there is a continuing violation, as Judge Wynn pointed out, of the constitutional right of access. The fact that things might be made available later is irrelevant. It puts the cart before the horse. And I wanted to go back to Judge Wynn's question, because I really do think that we started with this. Isn't there some narrowing that could be done here? And I think the answer is, of course. First, the judge should be instructed on the proper standard to be applied. But if there is something that needs to be done, first, in terms of the sealing, there would have to be kind of a case-by-case assessment of particular records and findings about why that information is going to so inflame the community that it can properly be kept secret. As Judge Davis and as came out in the other questioning, there's so much information out there that that's going to be a very hard standard to meet. And as to the gag order, clearly it's inappropriate to keep it as broad as it is. Again, I go back to why the standard is wrong. I just heard the defense counsel saying that they're concerned about publicity because they're concerned about statements by families and investigators. So step back and think about what's going on here. The judge has entered an order basically telling the whole world to stop talking about this. She doesn't have that power. So he was saying that a judge should do what's within her power. This is not within her power. That's what the Supreme Court said in Nebraska Press. You can't just enjoin the world to stop talking about things. This order does not prohibit the public in general from doing anything. It applies to anybody who knows anything about the case. That's not the public. That's a special subset of people, people who have. May I finish my question, counsel? Sorry. It's just a subset of people who know something about this trial that is particularly related to proving the elements or defending the elements in this case. And so you could argue whether or not the press right is no higher than the public. And the question is, you sort of get back to the question of whether or not does the public have a right to this, generally speaking. For example, grand jury testimony. You can't just walk out of the grand jury. Absolutely. It's a different factor. It's a different factor. But I'm saying so there are circumstances where a person could have potential information that puts them outside of the general public, and there may be limitations on their speaking that may impact negatively a case, correct? Do you agree with that? Could happen, absolutely. All right, so that's what this order does. Now, whether or not that's too far, but this is not a general public. Like I said, Joe, Smoe, you can't say anything that you might want to say about this case. You can't hold a placard outside the courthouse, all those things. It doesn't say that, does it?  I don't know what those terms mean, but, you know, arguably anybody who worked at the mine. Which term do you not understand? In the order? No, the one you just ticked off. You said I don't understand what that means. What is an alleged victim in this case? What the government is accusing this defendant of, in part, is securities fraud. Who are the alleged victims who are bound by this order with respect to his securities fraud? I mean, that's the fundamental problem with this order. It's just a blunderbuss blanket order trying to shut down any discussion of the facts relating to this case, and that's inappropriate. Now, you're here on mandamus, as you well know. That's strict. That's a tough standard to meet, isn't it? We have to establish a clear legal right, and I believe that this Court's own precedent establishes that. And I'd go back again to the Charlotte Observer case. The argument here is, well, this change of venue should change everything, and that needs to be kept secret. What the Court was looking at in Charlotte Observer was a sealed motion to change venue that it said was improper, and it said what the standards are. So it's here to, you know, even if there's some, what I heard the defendant say, there may be some reason to keep things in that motion to change venue secret. This is much broader than that, and what Charlotte Observer says is even the change in venue motion should be public. So then should we tailor it such that only the parts that you clearly would win on, that we should change and the rest should stay in place? I'm sorry, Judge, I missed the beginning. Should we only look at those areas of the gag order, the sealed order, where you clearly would win and tailor it down to that? Is it sort of, you know, the least common denominator type calculus then? I think that where there's a clear legal right that's been violated under the mandamus standard, that should be decided. You know, what this Court has said is that where there are constitutional rights at stake, it's a de novo review. So I don't think you just defer to the district court. I think you have to look at the record and decide whether there is a basis for the order. And clearly there's no basis for an order that's this broad where there are alternatives available and where it's ineffective. It violates every one of the standards that this Court has articulated over and over again. Well, the district court, I don't know whether, and I won't get into whether or not the ultimate will be the decision of this Court, but what it seems like the district court was trying to get at, or at least it seemed to be, is that I'm trying to get, based on what I've seen in this case, what has been disseminated, my order only goes to preventing those prejudicial matters, what she termed the prejudicial. In other words, I guess they're tied to proving or defending elements in the case. That would be the prejudice, probative barriers to proving that. So in a sense, if we say that somehow that this only relates to its prejudice, it would be very difficult to ask a practical matter how do you police that, obviously. But that's what it seemed like the district court was trying to do. And I think, Judge, that's fundamentally, while I understand the impulse, that it's misguided in this case. What she's really saying is we don't want people expressing their anger and expressing their hostility. This is not a case like those cases where the Supreme Court has been concerned about due process, where the defendant has been quoted, or where you had a tape recording of him admitting to wrongdoing in ways that a jury might not be able to set aside. The issue is are there statements being said that are so inflammatory and so prejudicial that you can't find 12 individuals in a state of 1.8 million people who could uphold their duty as a jury to decide the case as instructed by the judge on the facts and evidence. And we don't just shut down the world talking because we're concerned about that possibility. And that's why I say it puts the court before the horse. Until the voir dire process is allowed to proceed, we don't know for sure. And there's nothing about this record that's different from Skilling or Musawi or any of the other cases, Abscam, Watergate. I mean, on and on, these cases have been litigated. Davis may have a question, but I want to just finish with after this. The question is, since you're on mandamus and it's a very strict standard, that what if this court, for example, would say it's already been brought up and that is whether or not you have just a blanket order vacating, and say this gag order and seal order, as in the posture here in these facts and what's before the court, is vacated unless within a week, one day, five days, whatever, the court forthwith rule on venue. In other words, in the sense that you have to do something you can't wait around. The venue motion does nothing to affect the problems with this gag order. And whether it's granted or denied, if the venue motion is denied, this order does not become constitutional so that there's nothing to be gained by putting that on. We don't know that. We don't know what the district court felt she saw. So you want us to take the long reach and mandamus the district court. But on this record, well, how do you know that she didn't see things that absolutely, if it continues, she will not sequestration, voir dire, none of those mechanisms are going to help save this case for a fair trial. And so basically, she would be saying, let's not continue any further damage until then. Just your reaction to that. Your reaction that we can't do that. Yeah, I don't believe that. You don't think we have the power to do that? No, no. You know you don't want us to do it, but do you have the power to do that? I believe that on the basis of the record in front of this court, the order that is before this court is unconstitutional, and it could not be supported even by findings of fact to presidential publicity. It's too broad. I mean, Nebraska Press, at a minimum. That notwithstanding, though, can't we, why can't we stay that decision until the district court does something? Otherwise, we're not saying it. Maybe you're right. Maybe it is unconstitutional. But there's nothing the court could do. There's no facts that the court could find that would justify a gag order as broad as the one here and as vague as the one here. It can't be done. The court has to amend it. Even if it found there was a sufficient factual record to say that there is a substantial probability that we cannot have a fair trial in this district absent some steps. And I don't think, this court has never gone that far. I don't think you could go that far. And I don't think the motion to change venue does anything to that. I mean, that's what the Charlotte Observer case was about. These are not the types of facts that justify this type of restraint. They're not the types of facts that justify sealing a record and denying the public's right to know what goes on in a very important case involving a very high-profile individual who is making allegations of wrongdoing against the judges and the prosecutor in the district where this is happening. The public has a right and a need to know that information. Thank you. All right. Thank you very much, counsel. Appreciate you coming down up to Richmond and being here. And we'll ask the clerk to adjourn the court today. And we'll come down and greet counsel. This honorable court stands adjourned, sign of the die. God save the United States and this honorable court.
judges: Roger L. Gregory, James A. Wynn, Jr., Andre M. Davis